Good morning, Your Honors. Brendan Simard on behalf of Appellant Michael Kralik, Mr. Harris. The first issue I'd like to address is the causal connection between the accident and the psychological condition of ill-being. This being the last argument, I'm going to cut right to the chase and tell you why I believe that the finding is contrary to the manifest weight of the evidence as a matter of law. The Commission found that Mr. Kralik had a psychological condition of ill-being. This is not one of these where they balanced the opinions of the doctors. They never made a specific finding as to which doctor they found more persuasive. But they found that he had a psychological condition of ill-being. But they said that he failed to prove that it's related to the accident of March 8, 2008. And the reason that he failed to do so, because nowhere in the histories given to the, I believe, eight mental health professionals who examined him or treated him or combination thereof, did he relate his psychological condition to the accident. And I agree with them. It's not related to the accident itself. Mr. Kralik did not develop depression and anxiety because he hurt his back and because he had to have surgery. He developed it starting in August of 1998 when he was told that he couldn't return to his batch compounder position. This was very important to him as he's successful in life. Then later in December of 1998, Dr. Levin gave him permanent restrictions and said, you're never going back to that position. And Dr. Levin noted depression right there in his records. And then in February of 1999, he was terminated from his appointment for the company policy because he had been off work for quite a while. Counsel, can you address one issue that's lurking here? And there is some medical evidence on both sides. But Drs. Hartman and Fink opine that the claimant's psychological issues predated his work history. It was a result of a longstanding problem. And therefore, the arbitrary commission ultimately found that the claimant failed to prove by credible evidence that the condition of well-being was causally related to the March 8, 1998 accident at work. So how do you discount the history regarding this disorder? Drs. Hartman and Fink did testify, as you said. But as I pointed out, in a lot of these cases, the commission will make a finding that say, we find Hartman and Fink to be persuasive and forget about Kim, Howard, and all the others. They didn't do that in this case. I think they found that his psychological condition was related to the loss of his job and not to the actual accident of March 8, 1998. And so the question becomes, when someone develops a neurosis as a result of losing their job because of a work injury, is that a disability caused by a neurosis is compensable if it resulted from an actual injury, and the work-related accident may not be the only cause of the neurosis? Where the commission went wrong in its analysis is they used the Chicago Board of Ed case, which is the so-called mental-mental case, where the school teacher developed mental problems because of he was concerned he had problems with the administration, his teaching load, et cetera. That teacher did not have a physical injury, but the commission said what caused Mr. Craylick's psychological condition were really personnel issues, such as losing your position, having a different job, and finally losing your job. And I don't think you can use the Chicago Board of Ed case in this situation because you have a physical injury. The analysis I'm referring to is on the bottom of page 18 and the top of page 19 of the arbitrator's decision, which is 26 and 27 of the appendix. On the TTV issue, the period of dispute begins after June 7, 1999. They terminated this man in February of 1999. Petitions are filed. All of a sudden they find a light-duty job for him after he's been terminated for four months. They said, come on back, we found you a light-duty job. My client went, psychological condition, everything. He went. He lasted six hours. It was a 12-hour day that he was scheduled for, and it was a repetitive job where he would have to lean over 50 times a minute. And that's the testimony of the respondent's witness. He developed back pain after six days rather, sorry, six hours. And so he left, saw Dr. Levin. Dr. Levin wrote him a new prescription that said no repetitive work. Marilyn James, the company nurse, said she got it via the facts. Did you offer him a job? No. So here you have a person with undisputed permanent restrictions, no work that they can provide for him. This man should have a vocational rehabilitation assessment. They did absolutely nothing in that regard. I think they're liable for temporary total disability compensation up until the time that Dr. Levin opines that he's permanently and totally disabled. And for that I cited the Hunter case, which where the Supreme Court said that until a prescribed rehab program is completed, PPD cannot be determined. And that was a situation just as this one where the petitioner has admittedly reached maximum medical improvement, but he is in need of a vocational assessment. The respondent in that case raised the same argument. He can't have PPD because he's reached, his condition has stabilized. And the court said, and I read the opinion last night, second paragraph from the end, until he has a vocational assessment, he's entitled to PPD. My last issue is permanent disability. Why this decision is against the MAFIS weight of the evidence is that the commission fixed the date where the condition stabilized, where permanent partial disability can or should be determined at the June 7, 1999 date when he left the light-duty job. At that time he's working pursuant to a Over the passage of time, Mr. Kralik developed a recurrent herniation at the disc at L5-S1. Even their expert, Dr. Koh, who testified four times in this case, said in the summer of 2004, I've examined him again and I rate him at the recurrent herniation. Dr. Levin saw it and he knew this man's history with scar tissue, was aware of the psychological problems. The scar tissue is important because it removes the surgical option, which is one of the basics that he gave for opinion. He opined that Mr. Kralik was permanently and totally disabled. And he said among those factors in his decision was the psychological condition. So we look at the psychological condition. If it's related, then it's certainly relevant. But even if you took Dr. Hartman's and Dr. Fink's analysis all the way through, it was still part of the petitioner when he went to work on the morning of March 8, 1998. The employer takes his employees as he finds them. The opinion of Dr. Kralik that he's permanently disabled is unrebutted. He certainly saw the man for seven years, I think. This matter should be remanded with directions for the TTD and the permanent total disability suggested in my brief. Thank you. Thank you, counsel. Counsel, please. May it please the court, counsel, good afternoon. Robert Harris representing the employer Helene Curtis in this matter. This case is upon appeal based upon a manifest weight standard. The petitioner is asking the court to reverse the findings of the arbitrator and the commission in the circuit court, which found that there was no psychological causal connection between the psychological condition and the accident. This court is being asked to essentially substitute its judgment for that of the lower courts. As we have seen throughout the course of our arguments, it is the duty and function of the commission to Let me just get to the issue of where the facts are that support the decision. I think there's a great deal of weight here that supports the lower court's decision here. This was a huge case, very complex, nearly 3,000 pages in the record. Many, many doctors offered opinions and testimony. The fact is when there is conflicting opinions, whether it's between lay witnesses or experts, it is the duty and function of the commission. I'm trying to make your life easy for you, and you're making it difficult for us. We understand what the standards are. We get that. Tell us what evidence there is in the record that supports the finding of the commission. Everything that the arbitrator cited and relied upon and found that had the greatest weight and credibility, that is what supports his decision. As counsel stated, Drs. Hartman and Fink examined the petitioner. They found that Dr. Fink especially found that he was lying up the wazoo, that he was Counsel acknowledged that? Pardon me? Counsel acknowledged that? He cited Yes, he said that respondents examining physicians offered a testimony that was against the petitioner, and that's what the arbitrator relied upon. The arbitrator placed greater weight on the evidence, which shows that there was no causal connection between the later developed psychological problems, which some doctors found, and the original accident. What's the real problem here is that we have in the record, and which arbitrator acknowledged, different histories, different sources of alleged psychological problems given to different doctors by the petitioner. It's a commission's job to resolve those conflicts. Some of the doctors said that the psychological problems were not related, were not even existing, and they had conflicting diagnoses. Some said he had behavioral problems, which went all the way back to his days in school, where he was placed in special classrooms. The resolution of the conflicts between the medical experts is the task of the commission, and they did that. They resolved the conflicts. It's quite clear that we have some differing opinions as to the sources of petitioner's psychological problems. Why and how did he report these problems came about? And we have different reasons. And the weight of the reasons I submit was properly determined by the commission, including his complaints that the problems started not because of the injury to his back, but because of personal reasons, such as his alleged humiliation and embarrassment when he was asked to read something in front of his coworkers. That allegedly triggered a panic attack and other psychological problems. His humiliation at being asked to come back to work in a different position, his loss of self-esteem, even his marital issues were understood to be a source of his psychological problems. So what you're saying in so many words is, is that it's within the province of the commission to judge the credibility of the witnesses and the weight to be given to the testimony, and there is sufficient evidence in the record to support the decision of the commission. Absolutely. Absolutely. In fact, it's more than the basics. The minimal standard is if there is any evidence in the record to support the commission's finding, well, there's far more than just any evidence. There's a huge number of a huge weight of credible evidence that supports their findings. Even the doctors that supposedly are supposed to help petitioner offer opinions that really go against them. Dr. Kim, for instance, referred by Dr. Levin, said he had a single episode of major depression, which was started on August of 1988, 1998, after he found that his job was taken by another worker. He said that his depression single episode was related to job loss. He did not say his depression was related to his back accident. It's a condition, a personal condition that was related to his feelings regarding his job loss. We see this with other doctors as well. Dr. Kim said at that point he lost hope. At that point, at that point, he became extremely depressed. And petitioner, by the way, waited months until he sought any treatment or evaluation regarding his psychological problems. Dr. Howard noted a different source, a different cause for a psychological problem. It was the reading incident, the alleged humiliation when he was asked to read something at work. Dr. Howard testified at that point he became very depressed and very anxious. That incident on the reading, the literacy incident, the dissent makes reference that his supervisor was aware he was illiterate, and at least she makes the inference or statement that it was done to embarrass him in front of his coworkers. Was there any dispute in the record that the supervisor was aware he was illiterate and did require him in public to display this to his coworkers? I would suggest that petitioner was not illiterate and that his claims to that position were rebutted quite successfully. He filled out a very complicated form regarding his job duties. The gentleman graduated from high school in the top one-third of his class. It defies common sense and logic for him to claim that he was illiterate. It's just not possible. What about the supervisor back to that? Did he tell the supervisor he was illiterate? And then was that ever acknowledged? He may have testified that he told the supervisor this, but there's a lot of things which petitioner testified to which were rebutted by evidence in the record. Was that rebutted or was that banned? I cannot recall if he did. But even so, what does it have to do with a back accident sustained, you know, prior? If anything, okay, you can suggest perhaps that this was a separate new accident. If petitioner wanted to file a new claim that this reading incident somehow triggered an emotional, psychological attack, maybe that's a new accident. But it's certainly not related to his back injury. I mean, even the facts are so straightforward that this was a separate, personal, alleged humiliation. It has nothing to do with his back injury. And he never associated that it was. What was that reference he made to the petitioner graduating what in his class? In the top third of his class. The petitioner in this case? Yes. The Fink and his partner found that the reading incident had absolutely nothing that whatever to do with his psychological condition. He suffered from some narcissistic. Right. He had an attitude. From the time he was a child. Yes. An attitude readjustment problem rather than major depression and found that he was faking up and down. The Fink found he wasn't depressed. He had no depression or anxiety either. Right. That's why I'm saying there's conflicting, even conflicting diagnoses as to what is his psychological problem. Whether or not it even exists and whether or not it's related is another question. But it's up to the commission. It's their duty to resolve any conflicts in the record, in the evidence, in the medical testimony. And they did that. And like I said, even petitioner's own doctors offer opinions they could have found to be against the petitioner. Dr. Howard, the embarrassment by people finding out what he could not read, that led to his psychiatric condition. That's Dr. Howard's testimony. Not that he had a back injury. His symptoms became severe and became very anxious and embarrassed. And that's when his symptoms began, according to Mr. Kralik. We have the petitioner himself giving various histories, various reasons when and why he was starting to suffer psychological problems. And if they conflict, and they do, it's up to the commission to resolve those conflicting opinions. But he's telling at least some of his own doctors that the source of his psychological problems are something other than his back injury. It could be marital. It could be financial. It could be his loss of prestige. It could be the embarrassment of the reading situation. It could be his being upset about losing his job. And by the way, most if not all of these psychological factors are common to the general public and are not an increased risk of employment, which I submit would not be related back to the initial injury in any event. So without belaboring it, you're saying it's up to the commission to weigh all these factors? Absolutely. Okay. Circuit court adopted the commission's findings. No questions. And we're here now basically to act. This court is being asked to reassess and re-weigh the commission's determinations of credibility and conflicting opinions. And I suggest that the circuit court's findings confirming the commission are absolutely correct and should not be disturbed. Thank you. Thank you, Counsel. Rebella, please. Counsel did not tell you why this man lost his job. He lost his job because of his back injury. He lost his badge count on the job because of his back injury. He lost his entire job because he didn't return in time from his accident within the prescribed period. I want to correct a few things. He said he walked off his job when he was called back after six hours. He admitted he had no off-duty slip from any doctor. He just walked off his job and never went back to work. He claimed it was because his back hurt. No doctor, and he admitted it, gave him any off-duty slip. He just walked off his job and he hasn't been back to work since. I don't think that's correct, Your Honor. He went to the emergency room and then two days later he saw the surgeon, Mark Levin. Mark Levin gave him a new return-to-work slip, which he put no repetitive work on it. Did he go back to work with that slip? Dr. Levin faxed the slip to Marilyn James. Marilyn James said, I didn't offer him any more work, I didn't have any more work for him. To answer your question, he walked back. The answer is no. He never went back. That's correct. They never offered him anything. They were aware of his restrictions. Levin also testified that but for his psychological problems, which Fink and others found had nothing to do with his accident, he put him back to work. That's true. He would send them back with restrictions. Possibly some restrictions, I think is what he said. Possibly some. He never said what they were. No, he never said what they were. When he came up with his permanent total opinion, and he said, I think the guy is permanently and totally disabled, but if he didn't have his psychological problems, I'd send him back to work. Well, he also said that I think he would re-injure himself if he went back to work. It would be a danger to himself. And that's right in with the E.R. Moore definition of a medical permanent total. To get to the illiteracy issue, counsel says that my client is not illiterate. If you read what happened in this, he started crying in front of 30 coworkers. Now, what 28-year-old guy would cry in front of 30 coworkers? A person might do it if he had the deficiencies that Fink found he had, that Hartman found that he had, beating him all the way back to childhood. Couldn't a person do that if they suffered? That's conceivable. I would agree with you. Let's not lose sight of the fact that the commission never said that we believe Fink and Hartman over all of the others. They said he had psychological problems. They said he didn't relate them to the actual work injury. He related them to the loss of his job and then his position and then the loss of his job. And that, I think, should be compensable following the Amico case. Did he finish in the upper one-third of the class? That was my next point. Yes, he did. But he was in special ed his entire school career. They offered the transcripts. It was back in the days before the public law that says special ed students need to be included. He was in a special room all day. His report cards are in evidence. It was obviously an unweighted grade point average. So that's kind of disingenuous to say that he's in the top third of his class. He is, but, you know. Relative terms. Relative terms, yes. And as far as the marital issues, yes, he had marital issues. But if you're off work, you're not getting benefits, you're going through this. Marital issues didn't surface until much later, and I think it's quite understandable that you would have those after a period of depression, anxiety, interruption of income. Thank you. I think that's all I have to say. Thank you, counsel. The court will take the matter under advice for disposition.